164 So.2d 159 (1964)
LOUISIANA STATE MINERAL BOARD
v.
Marie B. ABADIE et al.
No. 6172.
Court of Appeal of Louisiana, First Circuit.
April 6, 1964.
Rehearing Denied June 1, 1964.
*160 Breazeale, Sachse & Wilson, by Victor A. Sachse, Baton Rouge, for Henriques.
Charles C. Jaubert, in pro per.
Earl H. Willis, St. Martinville, for Martel Heirs.
John M. Stewart, Lafayette, for Sparks et al.
Helm, Simon, Caffery & Duhe, by John M. Duhe, Jr., New Iberia, Allain & Rogers, Jeanerette, Edward A. de Lahoussaye III, Franklin, for Goudeau et al.
Lancaster, King & LeCorgne, by Chas. D. Lancaster, New Orleans, for Todd et al.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
This appeal presents for consideration the claims of various attorneys for fees for services rendered, said claims being predicated in some instances solely on the "fund doctrine" established in the case In re Interstate Trust & Banking Company, 235 *161 La. 825, 106 So.2d 276, and in others on alleged contracts and alternatively on the "fund doctrine", all of which said claims were rejected by the trial court and from which said adverse judgment all claimants have appealed.
The principle claim is that of J. C. Henriques, Jr., a complete understanding of which requires narration in some detail of the chronology of circumstances and events culminating in this litigation, which history, to some degree, reflects the basis of the claims of the other attorney-appellants herein.

THE J. C. HENRIQUES, JR. CLAIM
By virtue of a series of legal actions commencing with Buillard v. Davis, (1936), 185 La. 255, 169 So. 78, title to a certain tract of land containing 1,218.75 acres situated in St. Mary Parish, Louisiana, being that portion of Section 19, Township 17 South, Range 11 East, lying East of Doctor's Bayou and forming part of what is Belle Isle oil field, was determined to be vested in the heirs of Francois Gonsoulin and his wife, Marie Celeste De La Gautrais, and Claire St. Claire Gonsoulin (excepting an undivided 1/12th interest conveyed by the aforesaid Claire St. Claire Gonsoulin and Marie De La Gautrais to David Todd and Branch K. Miller). See Buillard v. Davis, 188 La. 38, 175 So. 742; Buillard v. Davis, 195 La. 684, 197 So. 273; and Buillard v. Davis, 201 La. 116, 9 So.2d 479.
In 1941, pursuant to the mandate of the state supreme court, contained in Buillard v. Davis, 195 La. 684, 197 So. 273, the district court, St. Mary Parish, named and recognized the owners of subject property and designated their respective proportionate interest therein, said owners then numbering approximately 840.
At the time of institution of the present action, the number of persons owning an undivided interest in subject property has increased to the extent that approximately 4,000 individuals now own a fractional interest therein.
Following establishment of title of the approximately 840 owners initially recognized by the district court as a result of the hereinabove cited decision, discussions were had from time to time among the various co-owners concerning the possibility of leasing the property held by them in common for mineral development. It soon became apparent, however, that because the vast number of co-owners lived in such a diversity of locations throughout the state and nation, granting an effective mineral lease on the property was only a remote possibility if indeed not an absolute impossibility notwithstanding mineral development of adjacent properties which clearly disclosed tremendous mineral wealth underlay the subject property. Meanwhile trapping rights granted by a number of co-owners produced revenue from which taxes on the property were paid, the excess of such income being committed to the administration of the Honorable C. Ellis Henican, a member of the New Orleans Bar. The fund thus established gradually accumulated to an aggregate of approximately $2,500.00 whereupon, in or about the year 1942, one of the co-owners, Miss Alice Miller, whose proportionate share of the property amounted to approximately an undivided one-sixth interest therein, retained the Honorable J. C. Henriques, Jr., an attorney at law, to determine her pro rata share of the accumulated funds being administered by Mr. Henican. In the course of discussing the matter with Mr. Henriques, Miss Miller made inquiry regarding the possibility of leasing the tract for mineral development and informed Henriques that another co-owner, a Mrs. Carlos, had previously requested advice from Mr. Henican regarding a means of leasing the land for mineral purposes. Henriques expressed the opinion special legislation was necessary to authorize the granting of a valid mineral lease on the property considering the unusually large number of owners and their dispersal over such a wide area. Miss Miller advised Henriques that Mr. Henican shared his views and was then in the *162 process of drafting special legislation for introduction at the 1952 regular session of the legislature to provide a means of leasing property held by large numbers of co-owners. At Miss Miller's suggestion, Mr. Henican contacted Mr. Henriques, sent him a draft of the proposed legislation and requested Henriques' assistance in securing passage of the bill after its introduction. (The proposed act was introduced as House Bill Number 911 by Mr. Koorie by request.)
At his own expense, Mr. Henriques, a former member of the legislature, spent considerable time contacting members of the legislature and explaining to them the need for the proposed legislation and the purposes intended to be served thereby. Largely through his efforts the bill passed the legislature and was enacted into law as Act 513 of the regular session of 1952, LSA-R.S. 30:181-30:188.
In essence Act 513 of 1952 provides that property owned in indivision by 500 or more persons may, at the request of any 50 or more co-owners, be leased for oil, gas and mineral development by the State Mineral Board for the benefit of all persons owning an undivided interest therein. In addition, the act provides the manner in which said leases shall be executed, the procedure for distribution of bonuses, delay rentals and royalties derived therefrom and authorizes deduction of 10% of all bonuses, rentals and royalties by the State Mineral Board to defray its expenses in handling such leases and distributing the proceeds thereof.
Following passage of Act 513 of 1952, Miss Alice Miller, a co-owner of the subject property, engaged Mr. Henriques to initiate the procedure prescribed by said act for leasing of lands owned jointly by 500 or more persons with the view of ultimately leasing the property for mineral development. Pursuant to contract with Miss Miller, Mr. Henriques drafted the necessary petition to the State Mineral Board (sometimes hereinafter referred to simply as the "Board") requesting said Board to lease the land for the benefit of all co-owners in accordance with the authorization contained in Act 513 of 1952.
By resorting to the judgment of the District Court of St. Mary Parish rendered in Buillard v. Davis, 195 La. 684, 197 So. 273, in which the numerous co-owners of the property in question were recognized and their respective fractional interests fixed, Henriques obtained the names and signatures of more than 50 co-owners as required by the statute. Together with the aforesaid petition and signatures, he also filed with the Board a sworn statement listing the names of all co-owners and their addresses when known. Mr. Henriques then prepared the notice required by Act 513 of 1952 to be published in East Baton Rouge and St. Mary Parishes advertising the property for mineral lease and development.
Inasmuch as this was the first instance in which the terms of Act 513 of 1952 were invoked, Mr. Henriques, with the assistance and collaboration of a member of the Attorney General's office, prepared a special lease form to be used in the event an acceptable offer were received in response to the advertisement of the property for lease. Several trips were made by Mr. Henriques from New Orleans to Baton Rouge in preparation of the lease form as well as the numerous other petitions and documents required by Act 513 of 1952 as a prerequisite to granting a mineral lease pursuant to its terms. Upon completion of all the necessary details, the Board proceeded to advertise the property for lease proposing to lease the interests of all co-owners. However, on December 14, 1953, prior to expiration of the time stipulated for the submission of bids, Belle Isle Corporation, owner of an undivided interest in the property, and its mineral lessee, Sun Oil Company, instituted suit in East Baton Rouge attacking the constitutionality of Act 513 of 1952. In its said suit, Belle Isle Corporation contended the Board proposed to lease the interest of all co-owners which would of necessity include its undivided *163 interest previously leased to Sun Oil Company, and in this regard the Board's action was in violation of the impairment of contracts clauses of the state and federal constitution. The temporary restraining order requested by Belle Isle Corporation enjoining the Board from advertising the land or leasing the same for mineral purposes was issued by the Nineteenth Judicial District Court, East Baton Rouge Parish, which also set a date for a hearing upon plaintiff's Rule Nisi for preliminary and permanent injunctions.
Upon receipt of notice of suit of Belle Isle Corporation attacking the constitutionality of Act 513 of 1952 and the consequent halting of proceedings by the Mineral Board in obedience to the temporary restraining order issued therein, Mr. Henriques immediately intervened in said action on behalf of Miss Alice Miller and Miss Therese Gonsoulin Rainold, both co-owners of the subject property. The suit of Belle Isle Corporation seeking to establish the nullity of Act 513 of 1952 was defended solely by Mr. Henriques without the aid or assistance of any attorney representing the Mineral Board or any other co-owners. After hearing, temporary and permanent injunctions were granted by the trial court of East Baton Rouge prohibiting the Board from proceeding further in the matter on the ground the act was unconstitutional for the reason urged by plaintiff, Belle Isle Corporation.
From this adverse determination, Henriques appealed the matter to the Supreme Court alone and unaided by any other counsel. On appeal to the State Supreme Court, the decision of the trial court was reversed and Act 513 of 1952 held constitutional and valid. Sun Oil Company, et al., v. State Mineral Board, 231 La. 689, 92 So.2d 583.
In turn, Sun Oil Company appealed the decision of the Louisiana State Supreme Court to the United States Supreme Court. In anticipation of the trial of the appeal before the United States Supreme Court, Mr. Henriques made preparation therefor including a trip to Washington, D. C. for the purpose of being sworn as a member and admitted to practice before the Bar of the United States Supreme Court. Ultimately, however, the appeal of Sun Oil Company was dismissed by the United States Supreme Court, 352 U.S. 962, 77 S.Ct. 1048, 1 L.Ed.2d 913; rehearing denied 354 U.S. 943, 77 S.Ct. 1395, 1 L.Ed.2d 1541, and the validity of Act 513 of 1952 thereby finally determined.
Subsequently, in numerous conferences with representatives of the State Mineral Board and the Attorney General's staff, Mr. Henriques was informed the Board insisted it would take no further action toward leasing the property unless the entire procedure was recommenced from the beginning. The position of the Board in this regard compelled Henriques to prepare a new petition, again obtain the requisite signatures and comply with all other provisions of the applicable statute, which he did. The property was then readvertised for lease by the Board resulting in two bids being submitted, one from Sun Oil Company and one from Shell Oil Company, which bids were opened at a meeting of the Board attended by Mr. Henriques. The bid of Sun Oil Company proposed to lease approximately one-third of the total acreage advertised and that of Shell Oil Company the entire tract. Each bid proposed a 1/6th royalty to the owner. Sun Oil Company bid a bonus of $155,000, which on a per acre basis, was higher than the bid of Shell which latter bidder offered a larger bonus but a smaller per acre sum inasmuch as its bid was for the entire tract. Henriques proposed that the Board accept the bid of Shell Oil Company not only because it covered the entire tract but also because he believed Shell would be more inclined to develop the land in view of Sun's determined and protracted opposition to the legislation which made possible the lease by the Board. Despite Henriques' protest, the Board accepted the bid of Sun Oil Company.
*164 Henriques checked the proposed lease submitted by Sun Oil Company and noted the plat attached thereto described one of the boundaries of the lease as "Doctor's Bayou" which meant that if Doctor's Bayou was located as shown on the attached plat of Sun Oil Company, the land belonging to the co-owners would comprise only about 350 acres instead of the approximately 1,218.75 acres which they claim. At Henriques' insistence Sun Oil was required to reform the description of the land leased and furnish a new plat showing the entire interest claimed by the co-owners to eliminate the co-owners' acquiescence in the lesser amount of property indicated by the location of Doctor's Bayou as shown on the initial plat attached to Sun's bid and lease proposal.
The aforesaid lease of a portion of the property having been satisfactorily resolved, Henriques then prepared another petition, obtained the necessary signatures thereto and requested the Board to lease the remaining portion of the property for the benefit of the co-owners in accordance with the provisions of the pertinent statute. The remaining acreage was duly advertised by the Board for the benefit of all co-owners and in response thereto a single bid was received by Sun Oil Company offering a 1/6th royalty and a bonus of $500,005.00. The meeting of the Board at which Sun's bid was opened was attended by Henriques as well as a representative of Belle Isle Corporation, the latter requesting the Board not to accept the bid because Belle Isle Corporation claimed ownership of the property in its entirety. Henriques insisted the bid be accepted taking the position that in view of Act 513 of 1952, the Board had no choice in the matter and could not do otherwise. When the representative of the Attorney General's office agreed with Henriques, the bid was accepted and the remaining property leased to Sun Oil Company for the consideration stated.
Prior to execution of the second lease by the Board, it was thoroughly checked by Henriques. At this time Henriques also computed the dollar amounts due the numerous co-owners from the first lease so that each would be apprised of his pro rata share of the $155,000 bonus derived therefrom and made this information available to all concerned by furnishing copies thereof to the Mineral Board and retaining further copies in his own office.
Since the leases were granted, Henriques has maintained constant contact with the Board in respect to various requests for unitizations in the Belle Isle field. It is undisputed that his efforts in this regard have always redounded to the benefit of all co-owners. It is likewise conceded several producing oil and gas wells have been completed on the property and royalties therefrom presently accrue at the rate of approximately $20,000.00 each month and that, at the time of the filing of this suit, the aforesaid bonuses and subsequent royalties aggregate approximately $1,000,000.
Following execution of the second lease, Henriques conferred with the Board regarding disposition of the funds then on hand in the sum of approximately $160,000 and was informed the Board desired to establish a procedure and adopt rules and regulations governing the submission of claims of co-owners to be paid their proportionate shares and would not pay or honor any claim until all claims were checked and verified. Inasmuch as the interest of Henriques' client, Miss Miller, had been fixed and established by the Supreme Court in Buillard v. Davis, supra, Henriques next brought a mandamus action in the Nineteenth Judicial District Court on behalf of Miss Miller against the Board to compel payment of Miss Miller's share of the bonuses received as well as any royalties which might subsequently accrue on production. The matter ended in judgment being granted in favor of Miss Miller ordering the Board to pay her her share of the bonuses as well as any royalties that had or would thereafter accrue. Although the Board paid Miss Miller, it did not, however, pay any of the remaining co-owners their proportionate share of the *165 accrued funds but instead engaged a special attorney to determine the current co-owners by revising to date the family tree of the numerous heirs. During the period of more than one year in which this project was in progress, the Board continually advised the co-owners their claims would be paid when the list of heirs was completed and made current by the Board's attorney. The matter remained in the status indicated until the passage of Act 358 of 1960, LSA-R.S. 30:186-30:188, which authorized the Board to deposit the funds on hand in the registry of the district court, St. Mary Parish, and plead all co-owners as in a consursus proceeding and thereby absolve the Board from further responsibility quoad distribution of the accumulated fund.
Despite such authorization no action was taken by the Board to deposit the funds as thus authorized. The Board's failure in this respect prompted Henriques, on behalf of several co-owners, to bring mandamus proceedings in East Baton Rouge Parish to compel the Board's deposit of the funds in the registry of the court in St. Mary Parish as authorized by Act 358 of 1960. The trial court declined to issue the writ of mandamus prayed for and Henriques appealed on behalf of relators. Before the appeal was heard, however, the Mineral Board paid into the registry of the court of St. Mary Parish the funds then held.
In addition to providing for deposit of the funds in the District Court of St. Mary Parish, Act 358 of 1960 also stipulated the procedure through which co-owners who had not been paid as well as any other claimants to the fund were permitted to assert their claims.
It is conceded Henriques has been paid by Miss Miller for services performed as her attorney, his compensation admittedly consisting of an interest of approximately an undivided 2% fractional interest of the whole property transferred by Miss Miller out of an approximate 6% interest possessed by her in the entire tract. Henriques herein claims entitlement to a fee of 15-20% from the owners of the remaining 94% undivided interest (excepting the Todd heirs with whom he has negotiated settlement) in the property under the "fund doctrine" recognized by the Supreme Court of this state in the case entitled In re Interstate Trust & Banking Company, 235 La. 825, 106 So.2d 276. In this regard it is contended on Henriques' behalf the fee claimed should be paid out of the bonus money presently accrued as well as all royalties which have been or shall be hereafter received under the leases mentioned, which leases allegedly resulted solely, only and exclusively from Henriques' efforts and services.
Henriques' claim is resisted by virtually all co-owners, excepting Miss Miller and the Todd heirs, on the following grounds:
(1) The case is not a proper instance for application of the fund doctrine as pronounced in the Interstate Trust & Banking Company case, supra, because:
(a) Henriques did not act for all co-owners but merely his own client, consequently his decision to demand remuneration from all co-owners was a mere afterthought;
(b) Henriques does not meet the "but for" test required by the Interstate Bank case, supra, inasmuch as he has failed to establish it was otherwise impossible to lease subject property except for the passage of Act 513 of 1952;
(c) It was not Henriques' efforts which produced the fund available for distribution but rather the efforts of the other attorneys-claimants herein who represented the innumerable heirs in settling ownership of the property by virtue of the litigation hereinbefore cited in addition to other suits and actions brought on behalf of various groups of heirs in St. Mary Parish and elsewhere as will hereafter be more fully discussed in considering the claims of *166 the other attorneys-appellants herein; and
(d) Henriques' action did not alone produce the fund as required by the rule of In re Interstate Trust & Banking Company, supra, because he was in fact assisted by some of the other claimants-attorneys as well as some co-owners in peforming services incident to granting of the leases by the Board;
(2) Adequate compensation has already been received by Henriques in that the interest conveyed to him by Miss Miller and the settlement received from the Todd heirs netted him approximately $50,000 as of the filing of this suit in addition to which he is entitled to 2% of all future royalties which may accrue pursuant to his acquisition of a 2% interest from Miss Miller which prospective income will amount to a considerable sum. On this basis it is contended Henriques would be unjustly enriched at the expense of the remaining co-owners were the latter held liable to him for a fee to be paid from their respective proportionate interests.
Generally the right of an attorney to remuneration for services is dependent upon a contract, either express or implied. Succession of Kernan, 105 La. 592, 30 So. 239; Succession of De Witt, La.App., 119 So.2d 669.
However valuable the services of an attorney may be to a party in a suit in which the attorney represented others having a similar interest, he cannot recover a fee from the party who has neither employed nor authorized another to employ him. Michon v. Gravier, 11 La.Ann. 596; Succession of Kernan, supra; Succession of De Witt, supra; Succession of Guichard, 225 La. 315, 72 So.2d 744.
An exception to the foregoing rule is recognized, however, in those instances where an attorney alone and at his own expense has successfully maintained an action for the preservation, protection, increase or creation of a fund in which persons other than his own clients may share or from which they may benefit. In such instances equity requires that all who benefit must pay the costs and expenses incident thereto, including attorney's fees. McGraw v. Andrus, 45 La.Ann. 1073, 13 So. 630; In re Interstate Trust & Banking Company, 235 La. 825, 106 So.2d 276.
The rationale of the exception established by the McGraw and Interstate Banking cases, supra, is conceded by the latter authority to be founded upon the rule stated in 49 A.L.R. 1150, as follows:
"The rule is that a court of equity, or a court in the exercise of equitable jurisdiction, will, in its discretion, order an allowance of counsel fees, or, as it is sometimes said, allow costs as between solicitor and client, to a complainant (and sometimes directly to the attorney) who at his own expense has maintained a successful suit for the preservation, protection or increase of a common fund, or of common property, or who has created at his own expense, or brought into court, a fund in which others may share with him."
In the Interstate Banking Company case, supra, the Supreme Court made the following pertinent pronouncements:
"The principal ground on which our decision on original hearing was based was that in Louisiana `the right of an attorney to remuneration for his professional services depends on a contract, either express or implied'. This is undoubtedly a correct and well recognized principle of law, but there are certain exceptions to this legal principle, and we have reached the conclusion, for reasons which will hereafter be apparent, that the facts of the instant case bring it under one of these exceptions.
* * * * * *

*167 "The doctrine which these attorneys, appellants, seek to invoke is well recognized and applied by the United States Supreme Court and other federal courts. See Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157; Central Railroad & Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915; Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184; Bishop and Collins v. Macon Lumber Co., D.C.1957, 149 F.Supp. 46.
* * * * * *
"Due solely to the efforts and industry of these attorneys in the case of In re Interstate Trust and Banking Company, 222 La. 979, 64 So.2d 240, a fund amounting to more than $700,000 was created and brought into existence, and except for their services none of the depositors would have received any interest on any of their frozen deposits. Consequently all depositors as a class benefited and were enriched by these attorneys' efforts. There can be no dispute as to this fact or as to the fact that these attorneys here are seeking attorneys' fees to be paid out of the very fund which their efforts created.
* * * * * *
"Under these facts and circumstances we can reach no other conclusion than that these attorneys have brought themselves within the scope of the doctrine which we have discussed above and on which they rely for the recovery of their fees, and that the facts of this case bring it under this exception to the principle on which our decision on original hearing was based. Consequently it is only fair and equitable that these appellants should recover reasonable attorneys' fees for their services."
It is contended by opponents of the Henriques claim that Henriques' action did not create the fund now available for distribution but rather said fund was created by the actions of those attorneys who established the claim of the Gonsoulin heirs to subject property. More precisely, it is contended title of the Gonsoulin heirs was settled by judgment of the District Court, St. Mary Parish, rendered and signed November 13, 1941, pursuant to the mandate of the State Supreme Court contained in Buillard v. Davis, 195 La. 684, 197 So. 273, at which time the heirs were approximately 840 in number. It is further contended that except for the settlement of title there could have been no lease of subject property therefore the services rendered by the other attorneys aided and assisted Henriques who consequently cannot be said to have acted alone.
The answer to this contention is rather obvious. Establishment of title of the Gonsoulin heirs merely recognized their respective pro rata interests which existed in them because of their relationship to an ancestor or ancestors who previously held title to the lands in question. Such right of ownership did not produce the fund presently available for distribution. The Gonsoulin heirs could have remained owners in indivision ad infinitum and the fund in question would not and indeed could not have accrued, existed or come into being until and unless the property were leased for mineral development. It is clear beyond doubt the fund in question exists because it was made possible by Act 513 of 1952.
It is next contended Henriques' action was taken solely for the benefit of his retained client, Miss Miller, and his entitlement to a fee from the remaining co-owners only an afterthought. The record, however, does not support this contention. Act 513 of 1952 which was passed virtually solely through the efforts of Henriques as hereinbefore shown, clearly provides that a lease granted subsequent to its provisions by the Board is for the benefit of all co-owners. The record further establishes the petitions drafted by Henriques pursuant to which the land was advertised for mineral lease by the Board and also the leases themselves were filed, executed and recorded for the benefit of all persons who owned an interest in the property. At no time did *168 Henriques purport to take action only for his own client nor did the Board do so by virtue of any document Henriques prepared.
Other aspects of the argument Henriques' action alone did not create the fund are that Henriques was assisted by Henican in preparing the proposed act introduced in the 1952 Regular Session of the Louisiana Legislature as House Bill No. 911 and eventually enacted into law as Act 513 of 1952, and, in addition, Henriques was assisted by some of the co-owners in obtaining the necessary 50 or more signatures to the petitions filed with the Board asking that the property be leased pursuant to Act 513 of 1952.
In answer to the first feature of the foregoing contention, while Henriques conceded Henican did assist in drafting the pertinent legislation, it is not disputed that when constitutionality of the act was assailed by Sun Oil Company, Henriques absolutely alone and unassisted resisted the suit. It is likewise not disputed that when the act was declared unconstitutional by the District Court, East Baton Rouge Parish, Henriques alone appealed the adverse decision to the State Supreme Court wherein through his singular efforts the decision of the trial court was reversed and the constitutionality of the act upheld. When the decision of the State Supreme Court was appealed to the United States Supreme Court, Henriques again, without the assistance of any fellow attorney, prepared to meet the challenge therein posed and went so far as to have himself admitted to practice before the bar of the United States Supreme Court to pursue the matter to its ultimate end. Upon termination of litigation which established the act's validity, it was Henriques alone who undertook the tedious, protracted procedure hereinbefore outlined which sought at all times to promote, protect and preserve the rights of all co-owners and eventually culminated in the granting of the leases. At no time was he ever assisted by any attorney representing either any other co-owner, the Board or the Office of the Attorney General of the State. Insofar as the record shows, Henican took no further action whatsoever following passage of Act 513 of 1952. Had not Henriques appealed the decision of the trial court declaring the act unconstitutional the Board could not have granted the leases in question. Accordingly, we conclude Henriques' action was exclusively personal and unaided insofar as concerns assistance or services allegedly rendered by other attorneys.
The contention Henriques' services were not performed alone because he was assisted by co-owners who, under his direction and supervision, aided in the obtaining of signatures to the petitions presented to the Board is hardly deserving of mention. It should be obvious, we believe, that what is meant in the present instance by "an attorney who alone performs services" is that the attorney seeking a fee must have alone performed the legal services which resulted in the creation of the fund. That he may have been assisted in the performance of incidental non-legal actions purely ministerial in nature by the laymen whom he represented does not obviate application of the fund doctrine in an otherwise applicable case. To so hold is to lead to patently ridiculous conclusions. If the rule advocated by the opponents were adopted, it could well be argued that an attorney did not act alone and was not entitled to a fee because his secretary assisted by typing the documents which he filed on behalf of his client. We do not believe the theory of the fund doctrine as announced in the hereinabove cited decisions of our State Supreme Court intended such an application. We do believe, and so hold, that the test to be applied in such instances is whether or not the attorney alone and unaided performed the legal services necessary to create, preserve, protect or increase the fund.
We shall next consider the contention Henriques is not entitled to the fee claimed because he failed to establish that a valid mineral lease could not be granted on subject property except for the provisions of Act 513 of 1952, the legality of which was established by his efforts. As *169 herein previously shown, in 1941, when the Gonsoulin heirs were recognized by the District Court, St. Mary Parish, and their respective fractional interests determined, there were then more than 800 heirs. At the time Sun Oil Company took its lease from Belle Isle Corporation and unsuccessfully sought to establish the nullity of Act 513 of 1952, the number of co-owners no doubt had increased greatly from the 840 initially recognized by the aforesaid trial court. That ownership of the land by such an unusually large number of co-owners made the execution of a valid lease thereon impracticable, if not impossible, was clearly recognized by the Supreme Court in Sun Oil Company v. State Mineral Board, 231 La. 689, 92 So.2d 583, from which we quote with approval the following:
"Indeed, when we examine the respective positions occupied by Belle Isle Corporation and Sun Oil Company in these proceedings, we are impelled to conclude that they are strikingly anomalous. The former, as a co-owner of the land involved in this litigation, is vigorously assailing the constitutionality of an act that provides the only practical method by which it can realize any profit from the minerals that may underly this land. And Sun Oil Company, in its strenuous effort to maintain the existence of a nugatory lease between it and Belle Isle Corporation affecting this property, is opposing the very act which would give it an opportunity to acquire a valid lease on the property which they purport to be so anxious to explore. * * *"
We observe that in the Sun Oil Company case, supra, the Supreme Court expressly recognized the sole purpose of Act 513 was to provide a method for the recovery of minerals in situations where, due to the large number of owners in indivision, exploration and production would otherwise be a practical impossibility. It is clear beyond question the instant case falls within that category.
Adverting now to the quantum to be awarded Mr. Henriques for his services in creating the fund in question, we note that on his behalf it is suggested that his fee be fixed at between 15 and 20% of the aggregate bonuses of $660,000 as well as all accumulated and hereafter accruing royalties. As previously stated, there presently exists a total accumulation of approximately $1,000,000 and royalties continue to accrue at the rate of approximately $240,000 annually.
Two distinguished members of the Louisiana Bar testified in Henriques' behalf regarding the value of services performed by appellant, namely, the Honorable Leland Richardson of the Baton Rouge Bar and the Honorable S. W. Plauche, Sr. of the Lake Charles Bar. Both attested to the enormity of skill, patience, perseverance and determination of Mr. Henriques, particularly in defending the validity of Act 513 of 1952, which made possible the leasing of subject property.
Mr. Richardson testified that in his opinion the scope and magnitude of the services rendered and the benefits derived by the co-owners therefrom were such that a fee of 15-20% of the accumulated fund as well as subsequently accruing royalties is justified and reasonable.
In substance Mr. Plauche expressed the opinion the services of Mr. Henriques were so unique and extraordinarily skillful (an opinion in which this court shares) and resulted in such a vast recovery, a fee of at least 20% of the accumulated funds as well as subsequently accruing royalties is warranted and should be awarded.
We note that in the Interstate Banking Company case, supra, the Supreme Court, after concluding attorney's fees were recoverable against all depositors, remanded the matter to the trial court for determination of the amount thereof. We believe, however, that the present matter has been sufficiently long pending before the courts that its termination on as early a date as possible is to the advantage of all parties concerned and, for that reason, we *170 have decided to fix the fee ourselves rather than remand this cause to the trial court for such purpose.
After careful consideration of the vast amount of work performed by Mr. Henriques over the protracted period shown, the skill, ingenuity and persistence of purpose displayed, the amount of bonuses produced by the leases, the presently accumulated royalties, the royalties which are currently accruing and which will accrue hereafter to the benefit of all co-owners, the 2% interest in subject property received by Henriques from Miss Miller which, with the settlement received from the Todd heirs, has to date netted him a return of approximately $50,000, we believe that allowance of an additional fee in the sum of 17% of the pro rata share of each co-owner, other than Miss Miller and the Todd heirs, in and to the aggregate bonuses of $660,000 only, will adequately compensate Mr. Henriques for the extraordinary services performed. According to our calculations 17% of $660,000 amounts to $112,200 which sum, diminished to the extent of 17% of the proportionate shares of Miss Miller and the various Todd heirs in and to said bonuses but augmented by the amount previously received by Henriques from his said clients and the royalties subsequently accruing by virtue of Henriques' 2% interest in the property, in our opinion, fully and adequately compensates Mr. Henriques for his services which redounded to the pecuniary benefit of all co-owners involved herein. Consequently judgment will be rendered herein accordingly.

THE CHARLES C. JAUBERT CLAIM
The intervention filed on behalf of Mr. Jaubert reveals his claim is founded on an alleged contract from the heirs of Lionel Goudeau, an attorney-at-law, who represented the Gonsoulin heirs in the various actions wherein the undivided interest of the Gonsoulin heirs in subject property was recognized, fixed and determined. In substance Mr. Jaubert alleges he was retained by Barbe Goudeau, one of the children of Lionel A. Goudeau, deceased, to open the latter's succession, a chief asset of which was the claim Goudeau, in the capacity of attorney-at-law, held against the Gonsoulin heirs for services rendered them in the litigation which established their rights in subject property. In 1942 Mr. Jaubert opened the Succession of Lionel A. Goudeau, deceased, and subsequently obtained judgment placing the heirs in possession. The estate possessed no funds but Barbe Goudeau, administrator with the full knowledge, permission and assent of the remaining Goudeau heirs, by verbal contract engaged Jaubert to recover whatever might be due decedent Lionel A. Goudeau from the Gonsoulin estate, it being agreed Jaubert would be paid for such services a contingent fee of 50% of any monies or properties obtained. Jaubert further alleges that after working from 1948 to 1953 to develop the claim of the Goudeau heirs against the Gonsoulin estate, he was informed in 1953, by certain of the Goudeau heirs, his services were no longer needed and he was thereafter prevented from representing said heirs.
By virtue of his alleged contract with Barbe Goudeau, Mr. Jaubert claims one-half of the Goudeau interest on either a contingent contract basis or quantum meruit. In the alternative he prays for reasonable attorney's fees against the Goudeau heirs on quantum meruit.
After trial but before submission of the case below, all of the Goudeau heirs named in Mr. Jaubert's petition of intervention filed an exception of prescription based on LSA-C.C. Article 3538. The exception of prescription was sustained by the trial court and Mr. Jaubert has appealed.
In urging our reversal of the judgment of the trial court rejecting appellant's claim four alleged errors are assigned. First, appellant maintains the trial court erred in sustaining the exception of prescription. Secondly, it is contended the lower court erroneously excluded from evidence *171 a document characterized as an "Act of Deposit" regarding which the following explanation is necessary: The interest of the Goudeau heirs in the fund derives from their father, Lionel A. Goudeau, who held written contracts with some of the Gonsoulin heirs calling for payment to Goudeau of a 50% contingent interest in any money or property recovered by Goudeau as their attorney. Many of the alleged contracts could not be produced and in lieu thereof appellant attempted to introduce in evidence an "Act of Deposit" executed by Lionel A Goudeau, before the then Clerk of Court and Ex-Officio Notary Public, St. Mary Parish, on December 9, 1938, wherein Mr. Goudeau presented to said Ex-Officio Notary certain powers of attorney or employment contracts under private signature purporting to transfer to him an interest in the Gonsoulin property as a contingent fee and reputedly signed by a large number of the Gonsoulin heirs. Whether any of the documents were signed by witnesses is not stated. Said Act of Deposit further declares that pursuant to the contracts, proceedings were taken in the case of Edmond Buillard, et al. v. Frank P. Davis. It further recites the declaration was made for the purpose of preserving Goudeau's interest in the property transferred by the various parties pursuant to the contracts. In addition, the Act of Deposit states the Ex-Officio Notary Public received the mentioned documents to form part of his "notarial records". It is to be noted that Goudeau heirs did not appeal herein, they being apparently satisfied with the judgment of the trial court recognizing their interest under those contracts they were able to produce and verify where verification was required. Thirdly, it is contended that trial court erred in ruling the fund doctrine did not apply to the claims of the Goudeau heirs, Mr. Jaubert, and the other attorneys-claimants. In this regard appellant argues that Mr. Goudeau (and therefore his heirs) was entitled to share in the fund even though it did not come into existence until after Goudeau's death. Having failed to appeal, the Goudeau heirs make no such claim in this court. Lastly, Mr. Jaubert contends the trial court erred in supplying and sustaining a plea of prescription as to the claims of the attorneys based on the fund doctrine. Considering Mr. Jaubert made no independent claim in his intervention and is seeking recovery solely from the Goudeau heirs, it follows that his claim under the fund doctrine is through L. A. Goudeau's rights under that concept from which it also follows that the issue raised by this last assignment of error is pertinent only if the error hereinabove thirdly assigned is meritorious.
The allegations of Mr. Jaubert's intervention to the effect he was prevented from further representing the Goudeau heirs after 1953 suggests on its face his claim for attorney's fees was vulnerable to an exception of prescription of three years.
We believe the following testimony of Mr. Jaubert appearing in the record sheds significant light on his relationship with the Goudeau heirs and the precise nature of his claim through them:
"BY MR. JAUBERT:
"When Mr. (Barbe) Goudeau entered into this agreement with me, he expressed the view that his father had these cases on a one-half contingent fee gasis (sic) and he felt it was only fair for the one who took over for his father to have half of what his father would have coming to him. As a result of our agreement, we drew up what was our agreement in a form here, the original of which is filed in the pleadings that I would like to now file this instrument, which is an unsigned copy of what our verbal agreement was.
"BY THE COURT:
"Was it intended to be signed by both of you?

*172 "BY: MR. JAUBERT:
"It was intended to be signed by all of the co-heirs but it never was signed. (Ev. 164-165Tr. 167-168)
* * * * * *
"BY: MR. JAUBERT:
* * * * * *
"This instrument which I would like to mark Jaubert-3This is a written instrument that we drew up putting in writing what the verbal agreement was between the administrator and myself, and it was requested that Barbe Goudeau would get his co-heirs to sign this agreement. In connection with it, we spoke to somemost of the heirs about it and finally after Lionel Goudeal (sic), Col. Lionel Goudeau, the oldest son I believe of Mr. Lionel Alfred Goudeau, came into the office to discuss the matter in the latter part of 1953, at which time he advised me that he did not believe that they needed a lawyer any further and that as far as he was concerned that I was no longer the attorney for the Goudeau heirs.
"BY: MR. SIMON:
"Your Honor, at this point, for the record, insofar as the offering of Jaubert-3 is concerned, counsel for the heirs of L. A. Goudeau objects that the instrument is an unsigned document, has no legal effect whatsoever. As I understood the testimony of the witness, he is not relying on any agreement, that he is simply presenting his claim here on a quantum meruit, is that right, Mr. Jaubert?
"BY: MR. JAUBERT:
"This is quite true, but the decision of a quantum meruit can be controlled in large measures by what the verbal agreement with the administrator was and all this instrument is, is what was put down in writing to express what the agreement was between the administrator and myself, and I am merely offering it in corroboration because it was prepared at that time, that's the agreement that was prepared and presented to the heirs which was what the administrator had agreed to but the heirs declined to accept. (Ev. 165-166Tr. 168-169)
* * * * * *
"BY: MR. JAUBERT:
"After this occasion of I think it was December 1953 when I was advised that I no longer was attorney to represent the heirs, I still had inquiries and contacts with various ones of the heirs and some of the attorneys representing other Gonsoulin heirs. Even though I had been dismissed as attorney for the Goudeau's, I continued advising with some of the Gonsoulin heirs whenever these lease brokers would come around and that happened two or three times every year, they came around asking my assistance to try and get a lease on this land.
* * * * * *
"However, my interest in the case after I was dismissed of course was very limited.
* * * * * *
"In 1961, after the act of 1960 was passed that became the law concerning the method of the distribution of this property, I again became actively interested in trying to bring this matter to a conclusion. In April of 1961 I started making contacts with the Mineral Board, with Mr. Carmouche and, of course, Mr. Bivins, and
"BY THE COURT:
"Whom were you representing at that time? Who were you working for?
"BY: MR. JAUBERT:
"I was representing my claim contingent interest through the Goudeau *173 claim in this succession at that time. Of course, it was tied in definitely with the Goudeau interest because I had no interest unless the Goudeau's (sic) had an interest, so I feel, though it was for myself personally, it was indirectly for the Goudeau heirs. I was also employed by a great number of heirs in the Boutte estate which was also affected by this act." (Ev. 166-168Tr. 169-171)
Although Mr. Jaubert testified further that since Mr. Barbe Goudeau did not personally discharge him he considered he was still representing Mr. Barbe Goudeau, it is readily apparent from the foregoing testimony that Mr. Jaubert was dismissed in 1953. Thereafter, the record discloses, his efforts were an attempt to preserve the contingent interest he believed he had obtained through the oral contract with the administrator of the Succession of Lionel A. Goudeau. It is unnecessary in the instant matter to determine whether the administrator of Goudeau's estate possessed authority to make such a contingent fee contract without authorization by the court. It suffices to say Jaubert himself unquestionably felt signatures of the various heirs to a written contract was required because an interest in the succession property was to be his fee for the services to be rendered, otherwise he would not have prepared a contract for signature by the heirs concerned.
Unquestionably Mr. Jaubert was entitled to a fee for the services rendered the Goudeau heirs from 1948 to 1953. Thereafter, however, he proceeded on his own initiative. The record does not disclose any apparent authority for him to represent the Boutte heirs or "some of the Gonsoulin heirs" referred to in the hereinabove quoted testimony. It appears therefore, that subsequent to 1953 Mr. Jaubert was working solely for his own interests and such incidental benefits as may have accrued therefrom to the Goudeau heirs. Upon Mr. Jaubert's discharge, his professional relationship with his clients terminated and they are not liable for the value of any services he presumed to render thereafter. It follows that prescription began to run on his claim for attorney's fees at the time of his discharge in 1953. His intervention seeking recovery of the fees allegedly due was not filed until August 23, 1962, and is therefore prescribed. LSA-C.C. Article 3538.
The record contains some suggestion that Mr. Jaubert claims entitlement to a fee as against all co-owners under the fund doctrine, independently of his claims through the Goudeau heirs. His petition of intervention, however, predicates his claim upon the interest reputedly derived from the Goudeau heirs for services rendered to them. The apparent basis of this latter contention is testimony of Mr. Jaubert to the effect he assisted Henriques in securing passage of Act 513 of 1952, and aided in securing the leases which produced the funds presently available for distribution. The record, however, is barren of proof that Mr. Jaubert in any way participated in the defense of the action brought by Sun Oil Company to establish the invalidity of Act 513 of 1952, or otherwise aided Henriques in the appeal which ultimately upheld the constitutionality of said act. It is clear that when Act 513 of 1952 was declared unconstitutional by the trial court, all attorneys, save and except Henriques alone, abandoned all efforts to pursue the matter further. Had it not been for Henriques' singular efforts the decision of the State Supreme Court recognizing the legality of Act 513 of 1952 would never have been obtained. For all practical purposes it was this decision alone which made the leases possible. Mr. Jaubert played no part therein and is not entitled to a fee from all co-owners under the fund doctrine.
The conclusions herein set forth obviate the necessity of considering appellant's remaining assigned errors. Accordingly, the judgment of the trial court sustaining the exception of prescription filed on behalf of *174 the Goudeau heirs against the claim of appellant Charles C. Jaubert will be affirmed.

THE MARTEL GROUP CLAIMS
These claims are advanced by (1) certain attorneys who allegedly represented a large number of the Gonsoulin heirs in the proceedings which resulted in the aforesaid judgment of possession rendered by the District Court, St. Mary Parish, in 1941; (2) the heirs of those attorneys who have since died; and (3) the assignee of an interest conveyed by the attorneys in consideration of the assignee's advancement of costs of the litigation. The attorneys concerned are Paul B. Koonce, S. C. Mallot, J. Sully Martel and Hubert M. Ansley, the latter two being deceased. All but one of the heirs of J. Sully Martel, deceased, claim an interest for themselves and Mrs. Emma Dell Berry (the remaining Martel heir who made no claim on her own behalf). The heirs of J. Sully Martel tendered a claim on behalf of Mrs. Ethel Frost Caillouet, heir of Hubert M. Ansley, deceased. Mrs. Caillouet, however, made no appearance and was apparently not joined herein. The heirs of L. M. Dalgarn, deceased, assert a demand through Dalgarn as assignee of an interest from Koonce, Mallot, Martel and Ansley based on Dalgarn's advancement of costs of the litigation undertaken by the aforesaid attorneys on behalf of those Gonsoulin heirs purportedly represented. Although Mrs. Caillouet, heir of Ansley, has apparently never been made a party herein, the appeal nevertheless names her as an appellant.
The claims of the Martel group are predicated on more than 50 documents executed by acts under private signature wherein numerous individuals, alleging themselves to be Gonsoulin heirs, engaged the professional services of the several attorneys named to represent them and establish their respective claims in and to subject property, for a stipulated fee. In substance it is contended these attorneys are entitled to the fees specified and in the alternative to a reasonable fee against all co-owners under the fund doctrine.
The trial court declined to permit introduction of the documents upon timely objection based on the recognized rule that documents executed under act of private signature are not admissible until and unless the signatures thereto are duly proved. In addition, our learned brother below rejected the claims of the Martel group on the grounds they failed to establish valid contracts with the Gonsoulin heirs, they were not entitled to a fee under the fund doctrine and the claims, if any, were prescribed.
The documents in question, though not admitted in evidence by the trial court, nevertheless appear in the voluminous record. The majority of such documents were signed by Sully Martel whose signature thereto was duly proved, but no proof was adduced with respect to the signatures of the alleged clients appearing thereon.
We find no merit in the contention the trial court erred in refusing to admit said documents until the signatures of the principals were duly proved. It is well settled jurisprudence that an act under private signature is inadmissible in evidence until the signatures of the principals are proved. Griffith v. Towles, 6 Mart.,N.S., 261; Miller v. Wisner, 22 La.Ann. 457; Leibe v. Hebersmith, 39 La.Ann. 1050, 3 So. 283; Succession of Sallier, 115 La. 97, 38 So. 929; Carona v. McCallum, La.App., 146 So.2d 697. In such cases the proof required need not be authentication of the signatures in the act itself, it suffices that the signature he proved in open court, in the same manner as any other material and relevant circumstance. Carona v. McCallum, supra. Consequently, we find that the trial court correctly excluded all such proffered documents save those hereinafter noted and discussed.
A document, identified and hereinafter referred to as "Martel Exhibit *175 No. 4", signed by three persons, including one Ernest J. Vigneaux, purports attestation by two witnesses and is also accompanied by the affidavit of Vigneaux acknowledging his signature thereon.
Pursuant to LSA-R.S. 13:3720, this document was admissible as against said Ernest J. Vigneaux, provided it was not objectionable on other grounds. Had the attached affidavit been executed by one of the attesting witnesses in compliance with LSA-R.S. 13:3720, this act would have been admissible against all grantors without the necessity of obtaining or producing an affidavit or acknowledgment by each grantor designated therein.
The pertinent portion of Martel Exhibit No. 4 reads as follows:
"We, Ernest Vigneaux, Alfred Gonsoulin, Hardy Boutte, of the City of Port Arthur, State of Texas, do hereby employ J. Sully Mortel (sic), of the State of Louisiana, Attorney at Lawpracticing in the Parish of St. Mary, State of Louisiana, and the Supreme Court of that State, to try and prosecute for the heirs of Francois Gonsoulin, deceased, in compliance with the Powers of Attorney executed by the said heirs, and agreeing to give and to pay his fee and compensation for the faithful performance of said employment, fifty (50%) per cent of what is recovered for their virile share as heirs of the said Francois Gonsoulin, in accordance with the said Powers of Attorney, authorizing me so to do.
"This said compensation is to be given or paid as aforesaid whether a compromise is made with the full approval of our said constitutents or by final suit obtained in their favor.
"The said attorney does hereby accept said mission and agree to the terms contained in said agreement, signifying an acceptance by executing said agreement.
"Whereof, we have executed the aforesaid agreement, together with said attorney, on this day of, 1935, in the presence of the subscribing witnesses."
"Thus done and signed in triplicate originals."
Despite the recitation the act was accepted and executed by J. Sully Martel, it was not signed by that individual or anyone purporting to act on his behalf. When this instrument was offered in evidence the following objections were raised.
"BY: MR. STEWART:
"Your Honor, it would appear that this instrument refers to powers of attorney which are not attached whereby these particular people purport to represent the Gonsoulin heirs in general and, as such, I am going to have to object to it for that reason. And additionally, it perhaps purports to be predicated on powers of attorney granted by these persons under the Act of Deposit introduced yesterday by the Goudeau heirs, and consequently I would urge all of the objections that were made to that Act of Deposit insofar as this particular instrument is concerned as well.
"BY: MR. DE LA HOUSSAYE:
"In addition, Your Honor, I would like to urge an objection to the introduction of this evidence in that it purports include by reference or by some form of reference to powers of attorneyin compliance with powers of attorney executed by said heirs by instruments which are not attached to this instruments (sic) and therefore they are excluded by virtue of the operation of the hearsay rule and certainly this is not the best evidence of what is contained in those other documents."
Considering the circumstances shown, we believe the objections to the admissibility of *176 this act were properly sustained by the Honorable Trial Court. Although the document recites Ernest J. Vigneaux appears therein in a representative capacity upon the authority of certain mentioned powers of attorney, none of the referred to mandates are attached thereto or otherwise identified. Moreover, the document does not disclose whether the mentioned powers of attorney were by authentic act so that they might be accepted without further proof, neither does it recite the names or reveal the identity of those, among the many Gonsoulin heirs, who reputedly executed the powers of attorney to which reference is made.
Martel Exhibit No. 7, a document professedly signed by Sully J. Martel, H. M. Ansley and S. C. Mallot, relieving and discharging Clarence DeCoux from payment of attorney's fees, should have been admitted in evidence for the purposes therein expressed. The signatures on said document were in effect vouched for when the heirs of the grantors or signatories sought introduction of the instrument against their own interests. The document, however, does not establish the existence of a contract between the attorneys and any of the heirs. It has the effect, however, of releasing the individual therein named from the claims herein asserted by the Martel group.
Martel Exhibit No. 10 is acknowledged by one of the grantors named therein but the signatures to the instrument are unwitnessed. The provisions of LSA-R.S. 13:3720, which apply only to acts attested by two or more witnesses and acknowledged by either the grantor or one of the attesting witnesses, are therefore not fulfilled and this act was not admissible pursuant to the provisions of LSA-R.S. 13:3720. Nor does the acknowledgment in question conform with the alternative method of acknowledgment set forth in LSA-R.S. 35:511. Accordingly, we conclude this document was properly rejected by the trial court.
All claimants in the Martel group have predicated their claims upon express contracts but have failed to establish the existence of such agreements by legally acceptable proof. We find, therefore, the trial court correctly rejected all such claims.
It is undeniable the lawyers of the Martel group have in the past represented at least some of the Gonsoulin heirs. In Buillard v. Davis, (1936), 185 La. 255, 169 So. 78, the following attorneys are listed as representing the appellants who claimed by inheritance from Francois Gonsoulin and wife:
"L. A. Goudeau, of Grand Coteau, Alfred D. Danziger, of New Orleans, and N. A. Quintanilla, of San Antonio, Tex., J. Sully Martel, of Franklin, Hubert M. Ansley, of New Orleans, and Mallott & Koonce, of Houston, Tex., for appellants."
We note, however, none of the Martel group attorneys are listed as attorneys in the following cases all of which involved some aspect of the title to subject property: Gravet v. Gonsoulin, 10 La.App. 553, 119 So. 785; Gravet v. Gonsoulin, 10 La.App. 553, 120 So. 643; Vuillemont v. Gonsulin, 134 So. 419; Buillard v. Davis, 188 La. 38, 175 So. 742; Buillard v. Davis, 195 La. 684, 197 So. 273; Buillard v. Davis, 201 La. 116, 9 So.2d 479.
Inasmuch as the Martel group have failed to establish a contract with any Gonsoulin heir, no recovery may be had by them under any theory, contract, fund doctrine or otherwise. The conclusions reached obviate the necessity of considering the remaining contentions of these appellants.
Accordingly, it is hereby ordered, adjudged and decreed the judgment of the trial court be and the same is hereby amended in that said judgment is reversed insofar as it rejected and dismissed the claim of appellant, J. C. Henriques, Jr., and judgment rendered herein in favor of said J. C. Henriques, Jr., and against all co-owners, *177 excepting Miss Alice Miller and the Todd heirs, of the fund on deposit in this matter and held in escrow by the Sixteenth Judicial District Court, St. Mary Parish, recognizing, declaring and decreeing said J. C. Henriques, Jr. to be entitled to and be paid by preference, prior to payment of any costs incurred herein, out of said fund, an amount equal to 17% of that portion of the sum of the $660,000 bonus money belonging to all co-owners of subject property, excepting so much of said bonus previously paid or due Miss Alice Miller and the Todd Heirs, which amount said District Court is hereby authorized and directed to pay and deliver to said J. C. Henriques, Jr. forthwith upon the finality of this decree.
It is further ordered, adjudged and decreed that except insofar as the same is hereinabove expressly amended, the judgment of the trial court is affirmed. Costs of these proceedings to be paid out of the fund on deposit in the trial court.
Affirmed in part, reversed in part, amended and rendered.